MALDONADO, PLAINTIFF AND APPELLANT, *v.* PORTO RICO DRUG COMPANY, DEFENDANT AND APPELLEE.

APPEAL from the First District Court of San Juan in an Action for Damages.

No. 2624.—Decided April 17, 1923.

DAMAGES—NEGLIGENCE—EVIDENCE—MANIFEST ERROR.—The evidence examined in this case having been analyzed, it was held that the district court committed such manifest error in weighing it that even if it should be considered contradictory the conclusion of the court would have to be reversed.

ID.—ID.—ID.—The evidence being considered in connection with the last paragraph of section 1804 of the Civil Code, it was found that it was not sufficient to establish the defense that the defendant had exercised the diligence of a good father of a family to prevent the damage.

ID.—ID.—PLEADING—PROOF OF DAMAGES—SERVICES OF MINOR.—Loss of services is not a special damage that must necessarily be alleged. The amount of damages to which a father is entitled for the death of a minor child caused by the negligence of another is a sum which, considering all of the circumstances of the case, is fair and reasonable; and in determining the amount of damages consideration may be given not only to the loss of the services of the child during his minority and to the expenses of medical assistance and burial, but also to the anguish and mental suffering of the parents.

ID.—ID.—ID.—EVIDENCE.—It was alleged by the appellee that as the plaintiff did not prove that he was the lawful father of the minor Luis Maldonado, he has no right to recover under the law in force at the time of the accident. In the complaint it was alleged that the plaintiff was the "*father* of Luis Maldonado*" and this allegation was established at the trial as follows: Josefa Quiñones testified that she was the wife of Ignacio Maldonado, the plaintiff, and that "she had a *son* named Luis Maldonado." The plaintiff testified that he was the husband of Josefa Quiñones, who had just testified, and that he had a son named Luis. The other witnesses in speaking of the boy called him "son" and in speaking of the parents called them merely "parents." *Held:* That that evidence, to which no objection was made, shows that the said boy was the legitimate son of Ignacio Maldonado and Josefa Quiñones.

The facts are stated in the opinion.

*Messrs. C. Coll Cuchí, P. González García* and *P. Nelson* for the appellant.

*Mr. A. R. de Jesús* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Ignacio Maldonado brought this action against the Porto Rico Drug Co. in the District Court of San Juan to recover $50,000 as damages for the death of his son Luis, eight years of age, caused by certain capsules of chenopodium improperly sold by the defendant. The defendant pleaded a general denial and alleged as affirmative defenses that if the boy died of poison his death was not caused by the drug itself, but because of lack of care in administering it; and that the defendant had exercised the care of a good father of a family in employing the clerk who sold the said drug.

The case was brought to trial and after the examination of much oral and expert evidence the court finally rendered judgment dismissing the complaint and imposing the costs upon the plaintiff. In the opinion, after referring to the pleadings, the trial court made only the following statement:

"After hearing the evidence at the trial the court concludes that the plaintiff has not proved that the child Luis Maldonado died of poisoning by chenopodium, or by any other poison, nor the damages sustained by the plaintiff because of the said death."

The plaintiff appealed to this Supreme Court and assigns three errors, as follows: 1, The court erred in finding that the plaintiff did not prove that the child Luis Maldonado died of poisoning by chenopodium, or by any other poison. 2, The court erred in finding that the plaintiff had not proved the damages. 3, The court erred in dismissing the complaint.

The issue being thus joined, we shall consider the first error assigned. It is necessary to review the evidence. In

order to sustain the first assignment the evidence would have to show, first, that the child Luis Maldonado died on August 19, 1920; second, that his death was due to the capsules of chenopodium administered to him on August 18, 1920; third, that the said capsules were sold by the defendant; fourth, that the sale was made negligently by delivering capsules containing a greater amount of chenopodium than the physician prescribed.

With regard to the first there is no doubt. Luis Maldonado died early in the morning of August 19, 1920, and his death was registered in the civil register of Caguas, the municipality where the death occurred.

The second proposition requires the examination of much documentary, oral and expert evidence.

The documentary evidence consisted of the certificate of death and the certificate of the autopsy. The first was offered as follows:

Plaintiff.—We offer in evidence, in the first place, a certificate from the Civil Register of Caguas showing the death of Luis Maldonado Quiñones.—Defendant (Attorney De Jesús.) What is the purpose of the party in offering this certificate in evidence? Plaintiff.—I offer the certificate in evidence.—Defendant.—We want to know the purpose.—Plaintiff.—To prove everything that can lawfully be proved by it. Judge.—The certificate, as the court sees it, is to prove the death of the person. Defendant.—If the purpose is to prove that he died on a certain day, we have no objection. Defendant (Attorney Tous).—Let it be shown that no objection is made to it as tending to prove the death of the child, but it is objected to as proof of any other fact. Judge.—It is admitted as plaintiff's Exhibit A.''

The certificate reads as follows:

''Number 113.—Luis Maldonado y Quiñones.—In Caguas, P. R., on the nineteenth day of August, 1920, at 9 a. m. before me, Doctor Víctor Coll y Cuchí, in charge of the civil register, appears Carlos Rivera, of age, unmarried, clerk, resident of Caguas, and declares: 1.—That Luis Maldonado, six years of age * * * born in Ca-

guas, white, without profession, and a resident of the ward of Bairoa of Caguas, died at 12.30 a. m. on August 19, 1920, as the result of poisoning by chenopodium, according to the certificate of Dr. A. García de Quevedo. 3.—That he was the legitimate son of Ignacio Maldonado and Josefa Quiñones, married and residents of Cáguas. 4.—That his paternal grandparents are Pablo Maldonado and Josefa Porrata, married, born in and residents of Caguas, and his maternal grandparents are Pedro Quiñones and Felipa Pérez, deceased. 5.—That he makes this declaration at the request of the family of the deceased. 6.—That the deceased is to be interred in the cemetery of this city. Thus he declared before me and in the presence of witnesses Rafael Arena, of age, married, clerk, born in Mayagüez and living at house number 56 of Padial Street, Caguas, and Ulises Martínez, of age, widower, pharmacist, born in Las Piedras and living at house number 34 of Jiménez Sicardó Street of Caguas, the said witnesses assuring me that the corpse referred to is that of the person indicated. This certificate having been read, it is approved and signed by all concerned in it and I have affixed the seal of this office and signed it. Carlos Rivera.—Rafael Arenas.—Ulises A. Martínez.—Dr. V. Coll y Cuchí, keeper of the civil register."

The second certificate is as follows:

"AUTOPSY ON THE BODY OF LUIS MALDONADO.—At 10 a. m. in the Municipal Cemetery. A boy of six or seven years of age, white, well formed. His body shows no external injury. Hypostatic congestion of the back and some bluish spots on the stomach and legs, showing the commencement of putrefaction. *Rigor mortis* very marked in the legs and very slightly marked in the upper limbs. The thorax was opened and all the viscera in this cavity found in normal condition. The lungs floated in water and the heart appeared to be empty. The abdominal cavity was opened and the stomach and intestines were found to be somewhat dilated by gases. The bladder contained about two ounces of urine. The kidneys, the pancreas and the liver were found in their respective positions and of normal size. The cranium having been opened, the brain was found to be in an anaemic and oedematous condition and the meninges somewhat congested, especially in their basilar part.".

The testimony describes the facts as follows:

The mother of the boy, Josefa Quiñones, testified in part as follows:

"On the first day I did not give him the medicine because he had eaten some candy brought by his father, but on the night of the following day I gave him a spoonful of oil, according to the doctor's instructions, and early on the next morning, as the doctor ordered, I gave him one capsule and half an hour later one spoonful of castor oil, and about 12 o'clock, after I had given him the medicine, he said that he was dizzy and lay down on a hammock in the sitting-room. I felt him and found that he was very limp. Then I sent for his father and when he came I called his attention to the boy's condition. He went out and sent a doctor and when the doctor arrived the boy was so nearly dead that he did not know me."

Referring to Dr. Rivas the mother testified:

"He asked me what I had given the boy and I replied that I had given him a purgative. He asked what it was and I took the box and showed him the remaining capsule and he said that the matter was serious, but it seems that he did not want to disclose to me, a disconsolate mother, the whole truth, but told it to the father when he saw him. Then the father came and told me that Dr. Rivera said that the boy was poisoned. I asked him to send for Luis (the physician who gave the prescription) and tell him that the boy was poisoned by the purgative prescribed by him. He came at about 3 o'clock in the afternoon in response to a telegram."

To questions by one of the defendant's attorneys she replied:

"He was not sick. He was a robust, contented and happy child. That is what hurts me. I seem to see him now. The only trouble with him was that he had lost his appetite. He sat at the table and ate very little. So I said to his father that something must be done because the child must not be left in that condition."

The father of the boy testified in part as follows:

"I had gone to town to see Pancho Pereira and I had been there only 10 or 15 minutes when one of my sons arrived hurriedly on

horseback and told me to return home at once with a doctor because the child was very ill. * * *

"In the morning she was trying to give him the purgative. I saw that the child suffered greatly, so I sent for my horse and started away. When I was passing through the gate the child suddenly came out glad and called to me that he had taken one capsule. I was pleased because the child had suffered in trying to swallow the capsule."

To questions put by the defendant's attorney he said that on his return he observed that the child did not know him. He said: "I spoke to him and he did this, I took him this way and felt his head. * * * at short intervals he shivered * * * and as death approached his shiverings were stronger."

Then comes the testimony of doctors Rivas and González who attended the child. Their testimony is of a twofold nature. That of a witness who narrates facts directly observed and that of an expert who reaches certain conclusions by virtue of his special knowledge.

Doctor Rivas testified in part as follows:

"About the month of August I was called to attend this boy. His father came to me and engaged my services. I asked him what was the matter and he said that one of his children was seriously ill. As he lives a short distance from the town I asked him to tell me, more or less, what was the trouble and he answered that the child had taken some medicine and since then had become worse. I asked him what kind of medicine it was and he said it was a purgative for anemia. I asked him whether it was thymol or chenopodium and he replied that it was some capsules that smelled like *pasote*. I was then sure that they had given him chenopodium and asked him what amount had been given and the age of the child. He replied that the capsules were large. I immediately went to the house and found the child in a very serious condition of utter prostration and unconscious. He was slightly cyanotic; his skin was moist; he did not respond to any stimulant, and was very seriously ill. * * *

"This was about noon. I informed the family that the case was

serious and went to work on the patient. I promptly ordered a purgative, which was immediately brought and administered for the purpose of producing an evacuation. I also injected a wash into his intestines and then ordered an enema of strong coffee. I also ordered that he be given some strong coffee to drink and that hotwater bags be placed at his feet, because the extremities were cold. I remained for some time to observe the results and then went away. Shortly afterwards they came again for me and engaged another physician. This is all that I know. My prognosis was of serious illness.  *  *  *

"I was inclined to believe that that child had taken too much of the drug, considering the symptoms."

This doctor also said that when he attended the child he had verified the drug administered to him from the box containing one of the capsules. At the trial he was shown a capsule which had been admitted in evidence and he said that it was "perhaps the same" one that he had seen on the day referred to.

Doctor González, who arrived at the house later, testified in part as follows:

"One afternoon at about 2 o'clock I received an alarming telegram from the father of this boy informing me that he was seriously ill because of a purgative that I had prescribed for him. He asked me to come immediately.

"I immediately took an automobile and started towards Caguas and when going towards the house of Maldonado I found him waiting for me in town. In great grief he told me that the child was poisoned and I told him to come with me and we went in the same automobile. When I entered the house I found the mother disconsolate. I approached the bed and when I witnessed the pathological developments I was horrified. The boy was in a comatose condition; the cornea clouded; the pupil dilated; the tongue thick, and relative inanimateness. I immediately asked what medicine had been given to him and was told that he had been given the medicine that I had prescribed. I asked when that was and was told that it was some capsules that I had prescribed in July in Gurabo. I asked what kind of capsules had been supplied and the reply was that they were four large capsules. I

asked whether they were like these white capsules and was told that they were four large yellow capsules. That terrified me more and I told them that the child was poisoned and asked to see the medicine. The father brought some large yellow capsules and I told him that they had poisoned the boy, but that nevertheless I would try to save him.''

Apparently referring to the father, the doctor also said:

''I told him to call another doctor to share the responsibility with me. I immediately administered injections of camphorated oil and strychnine. I covered him with towels wet with strong coffee and gave him large doses of strong coffee to stimulate him and counteract the poison. We put him in a hot bath which relieved his suffering a little. In the meantime Dr. Quevedo came and we agreed that the child could not be saved. We did everything possible and exhausted all possible means, but when we saw how high his temperature was we had to admit that it was a desperate case. I came to San Juan. He died after 12 midnight, about 1 o'clock.   *   *   *''

Then came the testimony of Dr. García de Quevedo who had not such direct participation in the case as the others, but saw the child, heard the statements made at the time of his illness and death and finally performed the autopsy. In part he said:

''I examined the body and opened the thoracic, abdominal and cranial cavities. In the first I found nothing abnormal. The heart and lungs were sound; the abdominal cavity was in its normal position and of normal size; but in the brain I found marked oedema in the encephalic mass and a slight congestion of the meninges, especially in the part nearest the brain; and in view of medical history, in my opinion the child died of   *   *   *.''

He was interrupted and submitted to able and extended examination and cross-examination, but his testimony was not shaken to the effect that the child ''had died from a drug which affects the brain, because he had only oedema of the brain,'' and that the child ''had not died of illness,'' and that connecting the data that had been furnished him

as to what had happened with the result of the autopsy, it could be deduced that the death was caused by chenopodium.

There is also the testimony of Doctor Coll y Cuchí, who, in so far as pertinent on this point, said that any child who should take three of the capsules given to the boy in this case would die, there being no possible treatment to save him, and also that:

"The chenopodium reaches the intestines and from there passes immediately into the blood, and the circulation of the blood carries the chenopodium to every part of the body. It does not attack any of the neutral viscera; therefore the liver and intestines remain the same, though perhaps there may be a little congestion in the nervous centers which are poisoned. One of the characteristics of this medicine is to provoke a more abundant secretion. The meninges are two membranes, one covering the brain and the other lining the skull, and between these two membranes there is a very thin liquid, the purpose of which is to prevent shock when there is a too violent movement of the head. With friction this liquid produces more heat and is at the same time a lubricant which provokes a secretion greater than normal, thus producing pressure in the inside of the skull. It also provokes hyperaemia of the brain and begins an intercranial pressure of such a nature that the child immediately commences to lose his senses, all of its faculties, and as the brain, which regulates all of the functions of the body is very weak, convulsions ensue followed by coma and later by death."

In our opinion it is not possible to read the evidence which we have transcribed without being led to the conclusion reached by the father, the mother and the three physicians on the day of the occurrence. The boy was relatively well and out of bed in the morning. The only special thing that he took was the medicine. Three or four hours later the symptoms were apparent and a short time thereafter he died. And not only the laymen, but also the experts without any hesitation, attributed the death to the drug administered.

Does the expert evidence introduced by the defendant modify the conclusion that the facts have produced? Let us see.

The first to testify was chemist Del Valle Sárraga and the second Dr. Martínez Roselló.

Del Valle Sárraga examined the stomach, part of the small intestines, part of the liver, part of the brain and one of the kidneys and later testified that in these viscera he found no trace of poison of any kind. In answer to questions by the plaintiff he said that from the fact that he had found no chenopodium oil in the viscera it could not be concluded that the child had not taken chenopodium. He also said that if the drug administered is rapidly absorbed it is not possible to find it because it decomposes into simple bodies, and that a person could not die from poisoning by chenopodium without first absorbing it.

That being his testimony, instead of refuting it supports the theory of the complaint.

The testimony of the doctor is difficult to condense. It covers twenty-eight pages of the transcript. Its tendency is to show that Doctor González did not make a proper examination of the boy before prescribing the chenopodium; that the castor oil prescribed was insufficient; that the capsules were not properly administered; that coffee is harmful rather than beneficial in cases of poisoning by chenopodium; that the dose given to the boy was not necessarily fatal, especially if it had been given in the proper manner together with sufficient castor oil, and that the autopsy did not show that the child had died of poisoning.

With regard to the poisoning properties of chenopodium and the dose that can be given without risk, the testimony of the expert, which seemed to have great weight when he first testified, lost its weight when he testified the second time.

At the morning session he testified as follows:

"A.—A dose of three grams has been given. The Rockefeller Foundation, which has treated 50,000 cases among the Malays in the Philippines, has administered it in the following manner: The day before, a purgative of sulphate of magnesia (I must call attention to the fact that in this case notwithstanding the large doses no oily substance was used); only sulphate of magnesia was given on the day before; the following day, at 7 in the morning, one dose of one gram, that is 15 drops of the medicine, at 8 o'clock another gram; at 9 o'clock another gram; and one hour thereafter a purgative of castor oil. And in these conditions, according to the statistics of the Rockefeller Foundation, in 300,000 cases there has not been a single death. Q.—The doses have been of 3 grams? A. Three grams in one day. Q.—Equal to what? A.—Equal to 45 drops.

＊        ＊        ＊        ＊        ＊        ＊        ＊

"Q.—Is a dose of chenopodium of 10 minims poisonous? A.— No. The National Standard. of the United States says that the dose for a child is from 5 to 10 drops, and the United States Dispensary published in 1918, 17th edition, says also that the dose for a child is from 5 to 10 drops. Q.—Considering the density of oil of chenopodium, is 1 drop equivalent to 1 minim? A.—Considering the slight density and consistency of chenopodium, 1 drop is equivalent to 2 minims. Q.—So 10 drops would be 20 minims? A. Yes, 20 minims. Q.—Then 20 minims could be given? A.—Yes. Q.—To a child 6 years of age? A.—Yes. Q.—What is the largest dose of chenopodium oil that can be given to a child about 8 years old without danger of poisoning? A.—According. to experiments and observations made in the Saint Thomas Hospital of Panama it has been concluded that a child can be given one drop of essential oil of chenopodium for each year of its age. Therefore a child of 8 years could take 8 drops at a single dose. Q.—Which is equivalent to 16 minims? A.—Yes. Q.—Could that dose be repeated under certain conditions? A.—It may be repeated 3 times, following the method adopted for adults, that is, the repetition of the dose 3 times in one day. In the Saint Thomas Hospital the method for adults was as follows: 3 doses during three consecutive days, and afterwards a purgative of either castor oil or sulphate of magnesia. Afterwards they reduced the dose to one day and after the dose the purgative. Q.—How can that dose be re-

peated? A.—At intervals of two hours. The first dose is given; 2 hours later the second, and 2 hours later the third, although there is no fixed rule because some give the second 3 hours after the first and the third 3 hours after that while others administer the doses every 2 hours. In this there is no uniformity, the only purpose being to prevent rapid absorption, inasmuch as the medicine does not act immediately on the parasites. Q.—To what dose do you refer when you speak of the administration of 3 successive doses at intervals of 2 hours? A.—To 15 drops. In the said hospital, therefore, 45 drops have been given as a single dose in one day. Q.—How about a child? A.—A child of that age should be given one-third. Q.—What would that be? A.—Eleven and one-fourth drops. Q.—Each dose? A. Yes.''

At the afternoon session he said:

''Q.—You spoke about the comparison between a minim and a drop of chenopodium, considering its viscosity. Please repeat what you said. A.—I made a mistake when I spoke of that. I first said that chenopodium as an essential oil had little density and afterwards made a mistake in giving the equivalent of a minim, for I said the contrary of what I should have said; I should have said that one minim contains two drops of essential oil of chenopodium, but said that one drop was equivalent to two minims. Q.— One minim is one drop of water? A.—Yes. Q.—And how about one minim of essential oil? A.—Two drops represent one minim.''

So then, as stated by the expert called by the defendant, the dose for an adult is 22½ minims and for a child of eight years 12 minims, and in this case the child was given 30 minims, or a dose exceeding by 18 minims the proper dose for a child and by 7½ that for an adult.

The error of the court in weighing the evidence on this point is so manifest therefore that even if it should be concluded that the evidence was contradictory it would not be contrary to the constant jurisprudence of this court to correct that error on appeal.

The foregoing points having been made clear, let us see whether or not the capsules of chenopodium which caused the death of the child were sold by the defendant and

whether the sale was made under such circumstances as to render the Porto Rico Drug Company liable.

There is no doubt that the sale was made. This is a fact not disputed by the defendant. It is only necessary to inquire into the circumstances of the sale.

The father of the boy testified that his son was pale and suffering from nausea and he took him to Doctor González who after laying him on a sofa and examining him with several instruments, gave him a prescription that could not be filled in Caguas and was finally filled in San Juan at the defendant's establishment. He said: "I handed the prescription to the clerk who gave me a slip of paper and I went away. About half an hour later I returned and he gave me the medicine. I put it in my pocket and went home."

The box received by the father was handed to the mother and 3 of the 4 capsules that it contained were given by her to the child as she explained, following the instructions of Doctor González.

The remaining capsule was handed by the father to Dr. Coll y Cuchí, health officer and in charge of the civil register of Caguas, as appears from the testimony of the father and the doctor, and was offered in evidence at the trial.

Dr. González prescribed four capsules of three minims each. The capsule handed to Dr. Coll as the same as those given to the child contained 10 minims.

The defendant, by its clerk Francisco J. Moreno who testified at the trial, maintained that the capsules sold, as indicated in the prescription, were of 3 minims.

The evidence is, therefore, contradictory. If the testimony of Moreno is believed, the defendant is not liable.

On one side we have the testimony of the clerk and on the other that of the father, the mother, Dr. Coll, Dr. Rivas and the actual facts. The capsules of 3 minims, even if not taken one at a time as prescribed, but together, would

not have caused death; but the 3 capsules of 10 minims were sufficient to cause death inevitably, as said by Dr. Coll. Dr. González testified that if the capsules prescribed by him had been given irregularly, they might have caused some interior disturbance in the boy, but could not have caused his death. On the other hand, the 3 large capsules could have killed not only a child but an adult.

Furthermore, it appears that when Dr. González realized the seriousness of the case he asked for the box containing the capsules for the purpose of having the prescription duplicated. He went to defendant's drug-store and there, he says, the following occurred:

"To the first clerk who approached me, one who was in the back part of the store, I said: Please duplicate this prescription. He took the box and went to the prescription book where all of the prescriptions are kept, looked in it and immediately fetched the capsules."

And the capsules that were delivered to him contained 10 minims each, the same as those sold the first time.

The defendant attempted to contradict the testimony of Dr. González by that of its clerk Verdeguer, but he testified in such a manner that his statements of themselves show lack of truth and the negligence with which he acted.

It is true that if another clerk filled the prescription the first time he cannot be charged with the negligence of the second clerk, but the evidence was admitted without objection and it is at least an illustration of how the defendant acted through its clerk on that occasion. It is a fact not to be lost sight of that the capsules of 10 minims came from the factory prepared and those of 3 minims had to be made up in the drug-store. Verdeguer testified as follows:

"Q.—Do you know Dr. Luis F. González of Caguas? A.—I know him now. Q.—About the 16th or 17th of August, 1920, did you see Dr. González in the drug-store of the Porto Rico Drug Co.? A.—I did. Q.—Did you have any dealing or conversation with

him? A.—Yes. Q.—What was he doing there? A.—He came in with two other gentlemen and handed a box to me and said: Dupplicate this. * * * Q.—Would you recognize the box if you should see it now? A.—It was a small green box. Q.—Is this the box that you saw; does it look like it? A.—Yes. Q.—What did he say to you? A.—He asked me to duplicate that prescription. I took out an identifying slip to give him, but he said that he was in a hurry and what he wanted was some capsules of chenopodium. Thereupon I looked in the book of prescriptions and said to him: They have to be made up * * * Q.—Who looked in the book? A.—I did. Q.—What did you look for in the book? A.—The prescription. Q.—What did you find? A.—I looked in the book, found the prescription and offered him a slip which he did not accept, saying that he was in a hurry, but I told him that the medicine had to be prepared. * * * Q.—Why was it necessary to prepare it? A.—Because the prescription called for 3 minims and then. * * * Q.—You did not have the capsules of 3 minims already prepared? A.—No. Then he said to me: The capsules are already prepared. I then replied: We have capsules prepared, but of larger doses of 30 and 60 centigrams, and showed them to him. Then I showed him the small ones * * * Q.—What were the small ones? A.—They were of 30 centigrams. Q.—How many minims? A.—Five, more or less. Then he said to a gentleman standing beside him: 'Were the capsules of this kind?' And he replied that they were larger. Then he asked me to give him the large ones and as he was a doctor * * * Q.—Did you know then that he was a doctor? A.—Yes, because I heard one of the persons who came with him say to him: 'Doctor, let us go.' Then I knew that he was a doctor. Otherwise I would not have given him the capsules. Q.—Of what size were those you gave to him? A.—Of 60 centigrams. Q.—How many minims? A.—Ten minims, more or less. Q.—Look at these capsules. Were they of this size? A.—Of that same size. Q.—Were they of this shape? (Showing the witness plaintiff's exhibit C.) A.—Yes. After I handed him the capsules he asked for some castor oil, I asked him how much and he said half an ounce. I did not consult the prescription any more, because I had closed the book, and gave him half an ounce of castor oil and charged him 25 cents for both articles. Q.—Who paid you? A.—I did not notice. Q.—Did he ask for any note of the prescription at that time? A.—Yes he asked me for a copy. Q.—Did you give it to him? A.—Yes, I gave him an exact copy. Q.—Did the

copy say 3 minims? A.—Yes. Q.—When did he ask you for the copy; before or after you had given him the capsules? A.—Afterwards. Then the doctor went into the prescription department and spoke to Mr. Daubón. (Plaintiff.) Q.—Are you sure that on the day to which you refer you knew that the person asking for the capsules was a doctor because another person had called him so, but that you did not know his name? Is that correct? A.—I heard them call him Dr. González. Q.—You heard them call him what? A.—Dr. González. Q.—But you say that now after I ask you the question. When you spoke about it before you said that they called him doctor. A.—Yes. Q.—If you gave the capsules to Dr. González without paying any attention to the prescription, why did you not put them in another box instead of putting them in this box which has a label as follows: 'According to prescription of Dr. González'? A.—Because he said: Put them there; I am in a hurry. Q.—So you put them there notwithstanding the label * * *? A.—He asked me what was the dose and I told him. Q.—you say that you gave him the capsules without paying any attention to the prescription because he asked you to give him 4 capsules. Then why did you not put those 4 capsules in a different box, or why did you not cross out the label of this box, which is as follows: 'No. so and so. According to prescription of Dr. González'? A.—He did not give me time * * *.''

The conflict between the testimony of Moreno and the rest of the evidence must be adjusted, in our opinion, adversely to the defendant. ''The rest of the evidence'' is of such strength, clearness and weight and the actuality of facts to which we have repeteadly referred is of such a character that it is impossible to give credit to the obviously interested testimony of Moreno.

It does not appear expressly that this conflict was adjusted by the trial court, but even if it had been, we should reach the same conclusion, because the error committed may be classified as manifest.

The defendant set up the special defense of having exercised the diligence of a good father of a family, according to the last · subdivision of section 1804 of the Civil Code, as follows: ''The liability referred to in this section

shall cease when the persons mentioned therein prove that they employed all the diligence of a good father of a family to avoid the damage." And in support of this allegation it presented the testimony of Ramón L. Daubón and Francisco S. Bruno.

The former is the manager of the establishment in which the prescription was filled and he testified to the special care taken by the defendant in the department for the preparation of prescriptions and to the ability of clerk Moreno and the great confidence which he merits. The latter testified as to the good reputation and known ability of Moreno as a clerk.

To ascertain the effect of this evidence it is necessary first to determine the scope of the statute cited. It is the same as the last subdivision of section 1903 of the old Civil Code. The appellee cites no applicable jurisprudence. Nor have we been able to find any in the decisions of the Supreme Court of Spain. In his commentaries Manresa merely says:

"We need only explain the scope or extent of the liability imposed upon persons who must answer for damages caused by others, as well as the effects of this obligation:

"1st.—That the said liability ceases when those upon whom it is imposed by section 1903 prove that they employed all of the diligence of a good father of a family, the said section establishing a legal presumption of the culpability of the persons therein mentioned, for by reason of the relations of authority or superiority that they have over the authors of the damage the law presumes that they are liable the same as if the damage had been caused by their own fault or negligence, considering them as moral authors of the damage because of their failure to employ the necessary care or vigilance to prevent others from doing it. This is in accordance with the judgment of May 18, 1904, cited. But the presumption established by law is not absolute or *juris et de jure,* but *juris tantum,* and, therefore, yields to evidence to the contrary.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

"Our code has not followed the Italian school, but was rather inspired by the French doctrine, for it imposes the obligation to repair the damage by virtue of a *juris tantum* presumption of fault on the part of the person who has under his authority or dependency the author of the damage, arising from failure to employ the proper care or vigilance over the acts af their subordinates in order to prevent the said result. Hence, according to the last subdivision of section 1903, the said liability ceases when it is proved that those liable for the acts of others employed all of the diligence of a good father of a family. The reason for the obligation imposed is not representation, nor interest, nor the necessity that someone must answer for the damage caused by one who has no personality or means with which to answer for himself, but the implied or presumed non-performance of the duties of precaution and prudence imposed by the civil relations between the person liable and the person for whom he must repair the damage. For that reason the said obligation is found among those arising from fault or negligence." 12 Manresa, Civil Code, 610 and 617.

If the statute should be given the scope which the appellee apparently ascribes to it, any action brought under section 1804 could easily be made illusory. It is not sufficient to engage the services of competent employees. That is one fact to be considered. Something concrete should be shown in relation to the particular case under investigation.

The testimony of Daubón is general. There is nothing to show clearly how the defendant supervised the work of its employees or what method it followed to test their efficiency, or how it followed their conduct step by step, or what record it kept not only of their ability, but of their conscientiousness.

It is one of the most delicate missions that a man can be given—the preparation of prescriptions composed of poisons in many cases. The health and the life of the citizens depend upon the wisdom of the physician who prescribes and the ability and conscientiousness of the pharmacist who prepares the prescription. How often it is that health is impaired resulting in real disease and even in death due not

to lack of ability, but to lack of conscience of the pharmacist, who not having a drug in stock, substitutes another or one of different strength either to obtain the profit or to maintain the reputation of his store that it carries all drugs in stock! When a sudden and alarming case like the present occurs, then action is taken, but how many unknown cases remain in the background!

The evidence in this case being examined in the light of these facts and considerations, it is not sufficient to exonerate the defendant of its liability for the negligent act of its employee.

See the case of *Truyol & Co.* v. *West India Oil Co.*, 26 P. R. R. 321, 329.

Did the plaintiff prove the damages claimed? There is nothing in the evidence to show the amount of the expenses incurred by the father by reason of the illness and death of his child. No specific damage was proved. The only basis recognized by the jurisprudence as sufficient for the recovery of damages in cases of this kind is the death of the child.

The law in Porto Rico on this matter is the same as that in force in California and the Supreme Court of that State has held as follows:

"The main element of damages is the probable value of the services of the deceased child until its majority, the jury are limited by the actual pecuniary injury to parent. The loss of services is not special damages necessary to be pleaded. A verdict for $20,000 was set aside as excessive; Morgan v. Southern Pac. Co., 95 Cal. 510; 29 Am. St. Rep. 143. See, also, Cleary v. City R. R. Co., 76 Cal. 240, as to amount of damages which a father is entitled to recover for the negligent killing of his minor child." Pomeroy's Cal. Code of Civil Procedure, p. 123.

In the last case cited the court said:

"Under section 377 of the Code of Civil Procedure, the amount of damages which a father is entitled to recover for the negligent

killing of his minor child is such sum as, under all the circum-
stances of the case, is just and reasonable; and in determining the
amount of the recovery, the jury may properly consider, not only
the loss of the child's services during minority, and the medical
attendance and funeral expenses, but also the mental anguish and
suffering of the parents." *Cleary* v. *City R. R. Co.,* 76 Cal. 240.

Considering the circumstances of the present case, the
anguish and mental suffering of the parents must neces-
sarily have been intense. As to the probable services of
the boy, we only know that he was eight years of age, lack-
ing thirteen years of attaining his majority. In Porto Rico,
especially in very poor families, or families of limited
means, it is not rare that a minor works and contributes the
whole product of his labor to the general expenses of the
home. Much depends upon the health and personality of
the minor. We know nothing definite in this case, but it is
necessary to assign some value to the services of the boy.

Considering, therefore, the evidence as a whole, it seems
that the amount of the indemnity may be reasonably fixed
at $3,000.

The last question raised by the appellee in its brief is as
follows: It not having been proved that the plaintiff is the
lawful father of Luis Maldonado, he has no right of action
under the law in force at the time of the child's death.

In the complaint it was alleged that the plaintiff was the
"father of Luis Maldonado." At the trial Josefa Quiñones
testified that she was married to Ignacio Maldonado, the
plaintiff, and that "she had a son named Luis Maldonado."
The plaintiff also said in his testimony that he was the
husband of Josefa Quiñones who had just testified and that
he had a son called Luis. When the other witnesses speak
of the son they call him "son" and of the parents they call
them "parents" simply. The evidence was not objected to
and it warrants the presumption that the child was the
legitimate child of Ignacio Maldonado and Josefa Quiño-

nes.   See *Díaz* v. *P. R. Ry. L. & P. Co.*, 21 P. R. R. 73, and *Rivera* v. *Reyes, ante,* p. 420.

By virtue of all of the foregoing the judgment appealed from is reversed and substituted by another against the defendant for damages in the sum of $3,000.   Each party shall pay his own costs.

*Reversed and substituted.*

Justices Aldrey, Hutchison and Franco Soto concurred.
Mr. Justice Wolf dissented.

### DISSENTING OPINION OF MR. JUSTICE WOLF.

The court below found that the child in this case did not die of poisoning from chenopodium or any other drug.   To overcome this finding of the court it should have appeared in the record that this child would not have died if no chenopodium had been administered.   The court had a right to believe from the evidence that the child was very ill and may have died from natural causes, inasmuch as, although a doctor was called in, the prescription was not administered until a month later when any disease of the child may have progressed mortally.   The possibility that the child would have died without the drug or from natural causes is not rigorously excluded, as ought to be the case to justify a reversal.   No one of the experts saw him before his death and the testimony of his parents that tends to show he was well is contradicted by the mother's final determination to administer the drug, as well as by the fact that he was without appetite.   I am not sufficiently convinced that the court below was mistaken in its special finding, although my principal grounds of dissent are based on other considerations.   It may be added that, assuming, as apparently does the majority opinion, that a dose of three minims, given three times, would be harmless, then I am not without doubts whether it was clearly shown, given the special finding, whether a greater quantity was given.

I am strongly inclined to believe, however, from the evidence that even small doses of chenopodium may be dangerous if not promptly removed from the system. This was shown by the expert evidence. The mother gave clear evidence tending to show that after the administration of the drug the child neither vomited nor had a movement of the bowels. There was no evacuation. Hence it became evident, as declared by the expert for the defendant, that no sufficient dose of castor oil was given. If chenopodium is a mortal drug, as the expert declared, then a sufficient quantity of castor oil was not prescribed. Under these circumstances it seems to me that the defendant was not shown to be responsible for the death. At least it should have been demonstrated that the dose actually or supposedly given the child would have caused his death despite the administration of the due amount of castor oil.

This is a case which approaches closely to a homicide and where, as in cases of fraud and the like, the proof ought to have been clear and convincing. This position is strengthened by the judgment in favor of the defendant. If there was a lack of proof of culpability in any respect, it makes no difference that in arriving at its general conclusion the court made an erroneous finding. The burden remained on the complainant and appellant to show convincingly that the acquittal of the defendant was erroneous and to dispel the doubt that the death was due to the maladministration of the drug by the attendant doctor. *Non constat* that the child would not have died by any administration of the dangerous drug, given his actual condition. As testified, the child ought to have been examined before any dose was given, and the mother, without any warning from the doctor, waited thirty days.

I have not attempted to make any careful examination of the authorities with regard to proximate cause and the like, but it seems to me that *Schaffer* v. *Railroad*, 105 U. S.

249, is applicable. There the complainant was injured in a railroad accident and became thereby disordered in mind and body to such an extent that eight months thereafter he committed suicide. The defendant was excluded from liability. The Supreme Court said, quoting from the court below:

"It is admitted that the rule is difficult. But it is generally held, in order to warrant a finding that negligence or an act not amounting to wanton wrong is the proximate cause of an injury it must appear that the injury was the natural and probable consequence of the negligence or wrongful act and that it ought to have been foreseen in the light of the attending circumstances."

Given the fact that chenopodium is only ordinarily administered with copious doses of castor oil and after a careful examination by the attending doctor of the condition of the patient, it was not within the prevision of the defendant that the drug would be given without an adequate purge by castor oil. The main point of my dissent is that the possibility that the child would be alive today if castor oil in sufficient quantities had been given, has not been excluded.